UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| VOGUE TOWER PARTNERS VII, LLC, ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> The CITY OF ELIZABETHTON, ) <br> TENNESSEE, and the ELIZABETHTON ) <br> BOARD OF ZONING APPEALS, ) <br> ) <br> *Defendants*. ) | Case No. 2:23-cv-93 <br><br> Judge Travis R. McDonough <br><br> Magistrate Judge Cynthia R. Wyrick |

**MEMORANDUM OPINION**

Before the Court are Plaintiff Vogue Tower Partners VII, LLC's ("Vogue") motion for summary judgment (Doc. 25) and Defendants The City of Elizabethton, Tennessee ("the City") and the Elizabethton Board of Zoning Appeals' ("BZA") motion for summary judgment (Doc. 23). For the reasons that follow, the Court will **DENY** Plaintiff's motion (Doc. 25), and **GRANT** Defendants' motion (Doc. 23).

I.  **BACKGROUND**

This dispute arises out of Defendant BZA's denial of Plaintiff Vogue's application to build a 120-foot telecommunications cell tower in Downtown Elizabethton. The City is a municipality incorporated and organized under the law of the State of Tennessee. (Doc. 1, at 12.) The City created the BZA, which is tasked with reviewing applications for zoning-variance requests. (*Id.* at 3.)

On April 27, 2023, Vogue submitted a variance application to the BZA. (Doc. 27, at 60–61.) The application sought a variance to build "a 120-foot monopole [("cell tower")] that will allow multiple wireless telecommunication providers to improve and enhance their service capabilities."

1

(*Id.* at 60.) According to the application, denial of the variance would mean that Vogue's "Tenant Carrier[, Verizon Wireless ("Verizon"),] will not be able to construct the facility that is necessary to enhance its services capabilities." (*Id.* at 62, 253.) Verizon created propagation maps to depict the current cellular signal strength in the City, as well as to project what the signal strength would be with the proposed tower:





(*Id.* at 132–33.) According to the map key, areas shaded red or orange have "good" coverage, areas shaded green have "fair" coverage, and areas shaded blue have "poor" coverage. (Doc. 28, at 140–42.)

2

Emily Long, a Verizon radio frequency ("RF") engineer, testified that her employer "was looking to add capacity to the area," or to add "densification" to the area, rather than to fill a gap of coverage in the City. (Doc. 28, at 111–12.) Long noted her "best guess" as to where the proposed tower would be placed within the context of the existing propagation map:



(*Id.* at 161.) Verizon RF engineer, Tasharruf Khan, explained that Verizon's existing cell sites were experiencing capacity congestion. (*Id.* at 207.) He warned:

> If capacity congestion continues to increase and is not remedied, Verizon's customers will begin experiencing unacceptable deficiencies in their wireless service. The first effects will likely be customers experiencing slower download times for data, such as videos or other content. As the congestion increases, some customers may experience an inability to download any data.

(*Id.* at 208.) Further, increasing congestion could impact voice calls, which "could even impact emergency responders using the Verizon network." (*Id.*) He concluded that the new cell tower would remedy any "capacity restrictions." (*See id.*) The cell tower was to be built on a 0.28-acre parcel of land located on North Pine Street in downtown Elizabethton, Tennessee. (Doc. 27, at 60–63; Doc. 24, at 3.) The parcel sits at the corner of two public streets containing public sidewalks. (*See* Doc. 27, at 70.)

3

On July 6, 2023, the BZA held a public meeting to consider Vogue's variance application. (*Id.* at 171–90.) After extensive discussion, the BZA unanimously voted to deny the application. (*Id.*)

Vogue filed this action on July 26, 2023, claiming that the City violated 47 U.S.C. § 332(c)(7)(B)(i)(II), Tenn. Code Ann. § 13-24-301, and that the City's denial of Vogue's application was arbitrary and capricious. (*See* Doc. 1, at 11–15.) Vogue moved for injunctive and declaratory relief. (*Id.* at 13, 15–16.) On February 28, 2024, Vogue and the City moved for summary judgment on Count I of Vogue's complaint, that the City's denial violated 47 U.S.C. § 332(c)(7)(B)(i)(II). (Docs. 23, 25.) These motions are ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a

4

genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. The City's Motion to Dismiss the BZA as a Party

As a preliminary matter, the Court will address the City's request to dismiss the BZA from this action, which was included in its motion for summary judgment. (Doc. 24, at 5.) The City argues that the BZA's inclusion as a party is redundant due to it being an entity of the municipality. (*Id.*) Vogue states in its response that it does not object to dismissing the BZA without prejudice. (Doc. 29, at 27.) Accordingly, the Court will grant the City's request and **DISMISS WITHOUT PREJUDICE** the BZA as a party.

### B. The Telecommunications Act

Vogue argues the BZA's (*i.e.*, the City's) denial of its permit application amounted to an effective prohibition of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). (Doc. 26, at 3.)

According to 47 U.S.C. § 332(c)(7)(B)(i)(II), otherwise known as the Telecommunications Act of 1996 ("the TCA"), "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or

5

instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  The denial of an application to construct a wireless service facility has the effect of prohibiting the provision of personal wireless services when:  (1) there is a significant gap in service coverage; and (2) some inquiry was made into the feasibility of alternative facilities or site locations.  *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 805 (6th Cir. 2012).  A plaintiff is responsible for proving the existence of a significant gap in service coverage and to demonstrate "that a good faith effort has been made to identify and evaluate less intrusive alternatives, *e.g.*, that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc."  *Branch Towers, LLC v. City of Knoxville*, No. 3:15-cv-487 2016 WL 3747600, at *7 (E.D. Tenn. July 11, 2016); *T-Mobile Cent., LLC*, 691 F.3d at 808.

### i. Defining a Significant Gap in Coverage

Vogue argues that the variance is needed due to a significant gap in cell-phone service coverage.  Specifically, it contends that the level of capacity congestion detected in the City "requires improvement, specifically in the form of an additional cell site."  (Doc. 26, at 12.)  It warns that continued capacity congestion without intervention may lead Verizon "customers in this area [to] begin experiencing unacceptable deficiencies in their wireless service."  (*Id.*)

The definition of a "significant gap" in coverage under the TCA is subject to many different interpretations.  *See, e.g.*, *Powertel/Atlanta, Inc. v. City of Clarkston*, No. 1:05 CV 3068 RWS, 2007 WL 2258720, at *5 (N.D. Ga. Aug. 3, 2007) (explaining that "courts have differed significantly in their determinations of what constitutes a 'significant gap' in service coverage").  The First Circuit has explained that "a significant gap must be large enough in terms of physical size and number of users affected to distinguish it from a mere, and statutorily permissible, dead

6

spot." *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 57 (1st Cir. 2012) (internal quotations and citations omitted). The Tenth Circuit has stated that "isolated 'dead spots' or *de minimis* areas of noncoverage do not amount to a significant gap." *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 891 (10th Cir. 2016). The Sixth Circuit has not explicitly defined the term but has concluded that "only the relevant service provider's coverage matters when assessing a coverage gap." *T-Mobile Cent., LLC*, 691 F.3d at 807. This means that coverage by one provider—say, T-Mobile—does not factor into the determination of whether another provider—like Verizon—has coverage in that area. *Id.*

While the Sixth Circuit has not explicitly defined "significant gap" in coverage, it has established different ways a plaintiff can demonstrate a significant coverage gap. One is a propagation map, which shows the level of signal coverage in a given area. *Id.* (citations omitted). Typically, propagation maps will be accompanied by analysis from RF engineers describing the gap in coverage. *See, e.g., id.*; *Branch Towers*, 2016 WL 3747600, at *6. Another method is by looking at "in-building" coverage. *Branch Towers,* 2016 WL 3747600 at *6. "In-building" coverage describes the reliability of cellular service inside a building. *See T-Mobile W. Corp. v. City of Huntington Beach*, No. CV 10-2835, 2012 WL 4867775, at *4 (C.D. Cal. Oct. 10, 2012). Though evidence of actual customer complaints lamenting the lack of coverage is helpful to this inquiry, it is not a requirement. *See T-Mobile Cent., LLC*, 691 F.3d at 807; *see also Eco-Site, Inc v. City of Huber Heights*, No. 3:16-cv-00388, 2018 WL 3092901, at *22 (S.D. Ohio June 22, 2018) ("There is no requirement that actual customer complaints need to be submitted to demonstrate a coverage gap.") (citing *T-Mobile Cent.*, 691 F.3d at 807).

Vogue argues that the "significant gap" inquiry should be broadened. (*See* Doc. 26, at 22.) In 2018, the FCC stated in a declaratory ruling that a regulation preventing a provider from

7

densifying an existing wireless network, rather than merely expanding the network's reach, can also constitute an effective prohibition under the TCA. The 2018 FCC Declaratory Ruling in FCC-18-133 states:

> [A] state or local legal requirement will have the effect of prohibiting wireless telecommunications services if **it materially inhibits** the provision of such services. We clarify that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. **This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services, or otherwise improving service.**

*In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088, 9104 (2018) (emphasis added).

The Court will not adopt this standard. Sixth Circuit precedent outlines the test for evaluating an effective prohibition under the TCA. *See T-Mobil Cent.*, 691 F.3d at 805. As Vogue correctly notes, the Sixth Circuit has not adopted the FCC's standard. (*See* Doc. 26, at 7.) *Loper Bright Enterprises v. Raimondo* states that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." 144 S. Ct. 2244, 2273 (2024). Thus, the FCC's interpretation of the TCA can be relied upon as persuasive authority in so far as it helps define "significant gap," but the Court finds the FCC's interpretation unhelpful here. *See id.* at 2262 (stating that courts may "seek aid from the interpretations of those responsible for implementing particular statutes"). The FCC's interpretation addresses the meaning of "effective prohibition" under the TCA, and the Sixth Circuit has already established the meaning of this term. *See T-Mobile Cent.*, 691 F.3d at 805. The FCC's standard is unhelpful in defining "significant gap," and the Court will not rely on it in evaluating the present case.

Although the Sixth Circuit has not defined "significant gap," it held that the plaintiffs proved a significant gap existed in *T-Mobile Central*. 691 F.3d at 807–08. In *T-Mobile Central*, the Sixth Circuit found that RF propagation maps and drive test data, accompanied by an RF engineer report, were suitable evidence to show a "significant gap." *Id.* at 807. Further, it found that gap was "significant" because the RF engineer concluded that the "gap area includes both a major commuter highway and fully developed residential areas." *Id.* Thus, a gap including highly populated areas will be "significant" under the *T-Mobile Central* standard.

Other district courts across the Sixth Circuit have applied *T-Mobile Central* to determine whether plaintiffs have satisfied the "significant gap" inquiry. In *Branch Towers*, the court held that the plaintiffs "demonstrated a significant gap in service coverage through the propagation maps, the opinion of T-Mobile's engineer, [] and [the defendant's] own consultant." 2016 WL 3747600 at *6. The defendant's consultant specifically conceded that "there is very little signal coverage in the area" and that "the applicant has proven a need for the site for its coverage requirements to include the new 4G technology and the site is necessary to provide that coverage and to overcome the shadowing effect of surrounding hills and wooded areas." *Id.* at *5 (internal citations omitted). T-Mobile's engineer identified the gap at issue and attributed it to "insufficient signal strength for T-Mobile's customers to have adequate indoor voice and data coverage." (Doc. 22-1, at 550 in *id.*, Case No. 3:15-cv-00487). A description of the gap at issue—along with the types of evidence *T-Mobile Central* identified—and an admission of the defendant's consultant was sufficient to show a "significant gap."

Similarly, in *Eco-Site, Inc. v. City of Huber Heights*, the court held that an expert report "demonstrating the gap using radio frequency propagation maps that model coverage" was sufficient to show a gap existed. No. 3:16-CV-338, 2018 WL 3092901, at *7 (S.D. Ohio June 22,

9

2018). The court noted that "the gap in service is caused by a lack of reliable in-building residential and commercial coverage" and that it affected over 10,000 people. *Id.* Citing *T-Mobile Central*, the court found the gap significant "based on the number of people, the many businesses, and the busy roadways within the gap area." *Id.*

In *Tarpon Towers II, LLC v. City of Sylvania*, the court cited an RF engineer's conclusion that "the City was in the top ten worst zones in the region for service" when concluding that the plaintiffs demonstrated the existence of a significant gap. 625 F. Supp. 3d 667, 675 (N.D. Ohio 2022). Additionally, the court looked to other testimony identifying the gap as a "safety issue" along with explanations of "the significant increase in service this tower would provide to cover the gap" when reaching its decision. *Id.*

The evidence Vogue presents clearly contrasts with that from these cases, as it does not demonstrate a "significant gap" in coverage.

### ii. Vogue Fails to Prove a Significant Gap Exists

Vogue fails to provide evidence showing a significant gap exists in Verizon's coverage within the area at issue. Vogue argues that:

> [A] significant gap exists as shown by: (1) Verizon's propagation maps showing that the proposed facility will alleviate current capacity restrictions and also improve coverage; (2) the testimony of Verizon's radio-frequency engineers; (3) the report of Vogue's third-party wireless consultant; and (4) testimony before the BZA from Vogue's Project Manager.

(Doc. 26, at 9.) A "gap" describes a breach or deficiency in service. *See Gap*, *Black's Law Dictionary* (12th ed. 2024) (defining a gap as "[a]n opening, cleft, or breach in something"); *Branch Towers*, 2016 WL 3747600 at *6 (finding a significant gap after evidence demonstrated "insufficient signal strength" and "very little signal coverage"); *Eco-Site*, 2018 WL 3092901 at *7 (describing a gap as a "lack of reliable . . . coverage"). Yet, Vogue's evidence fails to show a

10

deficiency or lack of reliability in Verizon's current service. Long, a Verizon RF engineer, stated that Verizon was looking to densify its network rather than fill a gap in its coverage. (*See* Doc. 28, at 111–12.) Khan, also a Verizon RF engineer, explained, "*If* capacity congestion continues to increase and is not remedied, Verizon's customers *will begin* experiencing unacceptable deficiencies in their wireless service." (*Id.* at 208) (emphasis added). The proposed site for the cell tower is in an area with "good coverage." *See supra* Section I (listing the propagation maps); (Doc. 28, at 140–42 (describing the propagation maps)). This evidence shows that a deficiency in service could potentially arise in the future but fails to prove a present gap in coverage.

      Vogue's evidence that the new cell tower will improve coverage does not demonstrate a gap either. (*See* Doc. 26, at 13–14; Doc. 29, at 9.) While Verizon deemed the improvement of coverage in the area a "high priority," this directive does not prove a deficiency currently exists. (*See* Doc. 26, at 12; Doc. 28, at 153.) The testimony Vogue cites to highlight the new tower's ability to improve in-building coverage also lacks any material pointing to a current absence of in-building coverage. (*See* Doc. 29, at 9 n.25; Doc. 28, at 145–46 (describing evidence from the propagation maps and failing to identify any deficiency in coverage); Doc. 28, at 209 (stating that the new tower will "improve in-building coverage for Verizon's customers").) Proving that the proposed cell tower will improve Verizon's coverage does not mean a gap in coverage exists. *See Cellco P'ship v. Bd. of Sup'rs of Fairfax Cnty., Va.*, 140 F. Supp. 3d 548, 582 (E.D. Va. 2015) (finding no gap in coverage when the provider was "trying to enhance its network" and to "improve its wireless telecommunications network").

      Vogue's reliance on its report from Waterford Consultants further demonstrates that Vogue attempts to show a significant gap in coverage exists by only arguing that the new cell

11

tower will improve coverage. Waterford concluded "[d]ropped calls may be experienced when using cell phones inside buildings in the areas depicted with coverage less than -70 dBm." (Doc. 27, at 286). Waterford later stated that -70 dBm is "required" for in-building coverage where "most customer devices are located." (*Id.* at 287.) However, in the report's summary, Waterford only confirms that the new cell tower would provide "network capacity enhancements" and that "coverage service levels would be improved." (*Id.*) One lone conclusion that Verizon's customers "may" experience deficiencies is not enough to show that the existence of a gap is a genuine issue of material fact, particularly when Waterford only concluded that the new tower will improve coverage and Vogue cites this report to show that the new tower will "improve" in-building coverage. (*See* Doc. 26, at 13–14 ("Waterford has independently confirmed that this proposed cell site is a viable solution that will meet Verizon's objectives for improving both capacity congestion and in-building coverage"); Doc. 29, at 8–9 ("Vogue's Brief details the extensive body of evidence explaining why the proposed cell tower will remedy current capacity congestion and will also improve coverage, particularly in-building coverage")). Vogue has presented the right types of evidence—propagation maps, analysis from RF engineers, measures of in-building coverage, etc.—but the evidence does not show a coverage gap.

If the Court were to find that Vogue has presented sufficient evidence of a "significant" gap, the first prong of the *T-Mobile Central* inquiry would lose all meaning. "[N]ot every gap in service is 'significant' within the meaning of the TCA." *City of Clarkston*, 2007 WL 2258720 at *5. Many courts have described insignificant gaps in coverage as "dead spots." *See id.* (listing different cases describing insignificant gaps in coverage); *Leonard*, 688 F.3d at 57; *AT&T Mobility Servs.*, 642 F. App'x at 891. Dead spots are "[s]mall areas within a service area where the field strength is lower than the minimum level for reliable service." 47 C.F.R. § 22.99; *see*

12

*also Leonard*, 688 F.3d at 58 ("Dead spots are defined as '[s]mall areas within a service area where the field strength is lower than the minimum level for reliable service,' and the presence of dead spots does not mean that service is per se inadequate") (internal citations omitted). Thus, a dead spot describes a small area with unreliable service, and the existence of a dead spot is insufficient to show a significant gap in coverage. Here, Vogue fails to show that the area at issue is plagued by a dead spot, as there is no indication that Verizon's service presently lacks reliability. If Vogue has failed to prove even an *insignificant* gap in service exists, the Court cannot hold that Vogue has satisfied its burden under *T-Mobile Central* of proving that a *significant* gap exists.

Vogue has failed to show, as a matter of law, that a significant gap in Verizon's current coverage exists. As such, the Court declines to consider whether Vogue meets the second prong of the *T-Mobile Central* test.

## IV. CONCLUSION

For the aforementioned reasons, Vogue has failed to show as a matter of law that the City's denial of its variance application violated 47 U.S.C. § 332(c)(7)(B)(i)(II). Accordingly, the City's motion for summary judgment (Doc. 23) is **GRANTED**, and Vogue's motion for summary judgment (Doc. 25) is **DENIED**. Count I of Vogue's complaint concerning 47 U.S.C. § 332(c)(7)(B)(i)(II) is **DISMISSED WITH PREJUDICE**. The Court declines to exercise jurisdiction over Vogue's remaining state-law claims.[1] Accordingly, Vogue's remaining claims are **DISMISSED WITHOUT PREJUDICE**.

---

[1] "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006). Continuing to exercise supplemental jurisdiction should only be done "in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [] concern over needlessly deciding state law issues." *Id.* (internal quotation omitted). When "all federal

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

law claims are eliminated before trial, the balance of factors to be considered under pendent jurisdiction doctrine, judicial economy, convenience, fairness, and comity, will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Because the claim over which the Court has original jurisdiction has been dismissed, the basis for the Court's original jurisdiction is extinguished. The Court finds that the interests of judicial economy and abstaining from needlessly deciding state-law issues weigh in favor of declining to exercise supplemental jurisdiction over the remaining state law claims.

14